STATE BOARD OF EDUCATION *v.* AYCOCK.

4-5602                                                    130 S. W. 2d 6

Opinion delivered June 26, 1939.

*Jack Holt,* Attorney General, *Leffel Gentry,* Assistant Attorney General, and *J. F. Koone,* for appellants.

*Mann, Mann & McCulloch,* for appellee.

McHANEY, J. The General Assembly of 1939 enacted Act 345, which "empowered and directed" the State Board of Education "to lend the sum of Four Hundred Thousand Dollars ($400,000) from the Permanent School Fund to the State School Equalizing Fund," and to issue a sufficient number of Certificates of Indebtedness for the purposes of the Act which "shall be correctly and numerically registered by the State Treasurer and shall be in such amounts as to cover the loan made at the time the Certificate or Certificates are executed." They shall bear interest at 4 per cent. per annum, payable on January 1, each year and mature on January 1, 1959. Payments of interest or principal shall be indorsed on the certificates, giving date of such payment, and all payments shall be made by vouchers on the State School Equalizing Fund. All or any part of

the loan may be repaid prior to maturity. Sections 1 and 2. Section 3 provides: "When the Certificates of Indebtedness as herein provided are properly executed and filed with the State Treasurer, he shall transfer the amount of said Certificates from the Permanent School Fund to the State Equalizing Fund." An emergency is declared on account of the insufficiency of available money in the State Equalizing Fund and that the sources of revenue for same "are inadequate to provide the money to keep the public schools open for a normal term."

Appellee, a citizen and taxpayer, brought this action against appellants, the Commissioner of Education, the State Board of Education and its members, and the State Treasurer, to enjoin the carrying out of the provisions of said Act. The complaint alleged that under the Statute creating it, § 11569 of Pope's Digest, the Permanent School Fund shall remain inviolate and be kept intact, be securely invested and safely preserved, and only the interest thereon be expended for the maintenance of the Schools of the State; that the transfer or loan as contemplated by the Act would be violative of §§ 1 and 2 of Art. 14 of the constitution in that it would amount to a diversion of the Permanent School Fund; that while the act denominates the transaction as a loan, it would in fact be a donation, resulting in a depletion of said Fund; that the consummation of the transaction would be violative of Amendment No. 20 to the constitution; and that, by § 11585 of Pope's Digest, the annual receipts of the State Equalizing Fund have been pledged to secure the payment of bonds issued by the State Debt Board, and that the certificates of indebtedness authorized would be without security, and, therefore, invalid.

To this complaint a general demurrer was interposed and overruled. Appellants declined to plead further, stood upon their demurrer, and the court enjoined and permanently restrained them from performing any of the provisions of said Act.

We think the learned trial court erred in so holding and in not sustaining said demurrer. The Permanent

School Fund and the State Equalizing Fund were created and established by the legislature. Neither has any particular constitutional protection except in § 2 of Art. 14 of the Constitution it is provided: "No money or property belonging to the public school fund, or to the State for the benefit of schools or universities, shall ever be used for any other than for the respective purposes to which it belongs."

Prior to 1931, Act 169, what is now known as the Permanent School Fund was designated Common School Fund of the State, § 8989, Crawford & Moses' Digest, being the Act of March 15, 1897, and the same language as to the security and safety of the fund is used in both acts.

While the language of the above constitutional provision is mandatory and would, we think, bar legislative sanction to use such funds for other than the support of the common schools, if levied and collected for that purpose, or for universities, if levied and collected for that purpose, we cannot agree that the proposed use of the money so borrowed is for other than school purposes. The emergency clause recites that the money is to be used or that it is needed "to keep the public schools open for a normal term." In *Ruff* v. *Womack*, 174 Ark. 971, 298 S. W. 222, we held that the Permanent School Fund might lawfully be loaned to needy school districts through the Revolving Loan Fund. The State Equalizing Fund is a fund to be used by the State Board of Education in assisting needy districts to keep their schools open for a normal or reasonable term. It is not a loan, but a gratuity. In *State, ex rel.* v. *State Board of Education*, 195 Ark. 222, 112 S. W. 2d 18, we said: "By appropriate Legislation either the State Debt Board, or the State Board of Education, may be authorized to lend the assets of the permanent school fund through any properly designated instrumentality, such as the revolving loan funds, and as security for the loans so made, bonds of school districts may be accepted. Either board may act as a business or accommodation agency and issue and sell its own bonds in substitution of the bonds pledged by the

school districts, paying only such interest as it receives from the districts, and being liable only to the extent of the collateral which it pledges. Any excess interest paid by such school district becomes revenue of the state and a part of the assets of the permanent school fund. The public characteristics, attributes, and state ownership of such revenue are expressly affirmed.''

We think this holding is authority for the proposed action under said Act 345. Instead of the Revolving Loan Fund, the State Equalizing Fund is seeking to borrow from the Permanent School Fund. Instead of bonds, certificates of indebtedness are to be issued. Instead of being secured by the bonds of the school districts to whom the funds were loaned in that case, the security is the relatively large income of the Equalizing Fund from the various sources dedicated to it by different acts of the legislature, more than one million dollars annually although it is not pledged. So we fail to find any wrongful or unconstitutional diversion of the Permanent School Fund under said Act.

It is also alleged that the transaction would in fact be a donation and not a loan. The Act provides it shall be a loan, for which interest bearing certificates of indebtedness shall be issued. There can be no merit in this contention.

Another allegation is that the certificates of indebtedness to be issued would be void as violative of Amendment No. 20, and great reliance is placed on the decision of this court in *Walls* v. *State Board of Education*, 195 Ark. 955, 116 S. W. 2d 354. We cannot agree that Amendment 20 is violated or that *Walls* v. *State Board of Education* is controlling. There is nothing in said Act 345 that in any way pledges the full faith and credit of the State nor is any of its revenues pledged. There is no pledge of any kind. The State Board of Education, under legislative direction, has the control and management of the Permanent School Fund as also the State Equalizing Fund. The former, it is directed to lend, safely keep and preserve, and only the income therefrom may be used for the common schools, not any part of the

principal. Whereas, the latter has a large income. During the last 12 months, June 1938 to May 1939, both inclusive, it had an income from cigar and cigarette stamps and permits of $552,914.49; from vending machine taxes, Act 201 of 1939, three months only, $4,381.94; from income taxes, $162,375.91; and a contingent appropriated income from land redemptions $300,000.00, a grand total of $1,019,672.34. As above stated, this money is used to assist impoverished school districts in operating a normal term of school. The money is not loaned to them, but is donated. But for this fund, many school districts in the State would have no adequate schools. In the Walls case, the Act provided for a loan to the board of control of the Blind School to be used to construct new buildings, and it was there argued that the school for the blind is part of the public school system, and to lend it the funds for such purpose would not be a diversion thereof. The court refused to accept such theory, as it was there said: ''Throughout the years the Blind School, as an entity separated from the common school system, has been supported and maintained by the State, and so far as we are advised by citations or otherwise, in the briefs presented to us, there does not seem to have ever been a time when the Blind School had a call upon the public school funds for support or maintenance. If there was ever a time when it was intended that the Blind School should be deemed a part of the public school system that fact has not been evinced by any suitable or appropriate legislation.''

And it was there further said: ''It would be using the funds for purposes never intended in the collection and accumulation thereof to convert them into a building fund for the erection of a non-income producing structure subject to obsolescence and decay. Even if it be a loan, as argued, there is no security for a part thereof, except the unacknowledged obligation of some future legislature to restore the fund.''

Here, the situation is wholly different. The Permanent School Fund is not being diverted to a different purpose. It is to be used for the public schools,—the im-

poverished and the needy schools, to keep them "open for a normal term." It is not being converted "into a building fund for the erection of a non-income producing structure." Its repayment does not depend upon "the unacknowledged obligation of some future legislature," except in the sense that it must be appropriated. The legislature of 1937, by § 6 of Act 283, appropriated, "for the purpose of complying with the provisions of the State Equalizing Fund Law," for the biennium, $2,000,-000 and in 1939, by § 9 of Act 236, $2,400,000. It cannot be presumed that the legislature would create this fund and give it this large income, and then refuse to appropriate it for the purpose for which it was created.

In 1931, the legislature enacted Act 207 which authorized the State Debt Board to sell the obligations of the State for such sums as it deemed necessary to pay the salaries of teachers in the public schools for that scholastic year, payable not later than two years from the date of the Act, and to deposit the proceeds in the State Treasury to the credit of the State Equalizing Fund which might be pledged as additional security. Two million dollars of obligations were sold and so deposited. This fund was then loaned, not donated, to school districts and their obligations taken. The above amount has been paid in full, not by said fund, but from the repayment to the fund by the school districts to whom it was loaned. So far as we are advised, the State Equalizing Fund is perfectly solvent, that it owes no indebtedness and that its income is not in any way pledged. It met the emergency as above stated and retired the pledge of its resources promptly.

We cannot assume or presume that any future legislature will destroy this fund by diverting its present sources of income or that it will fail to make appropriations for the purposes of its creation.

We conclude, therefore, that said Act 345 is a valid enactment, and that the court should have sustained the demurrer of appellants. The decree is reversed, and the cause dismissed.